## PARHAM and LOWRY *v.* S. M. COBB and O. B. COBB and W. H. HARRIS.

The bond given by one partner to obtain an injunction against his copartner, is the property of the latter, and not of the partnership.

The right of action upon the bond arises immediately upon the dissolution of the injunction.

The death of the principal in an injunction bond, is no reason for arresting the suit against the surety: his is a solidary obligation.

Where the condition of the injunction bond given by the obligors, is to pay such damages "as the defendant may recover against them," the phrase "may recover against them," applies to the surety in the same manner as it does to the principals. Recovery against the principals is not a prerequisite, therefore, to an action against the surety.

APPEAL from the District Court of the Parish of Madison. *Richardson*, J. *Snyder* and *Hynes*, for plaintiffs. *William Perkins*, for defendants. By the court:

PRESTON, J. ·The circumstances out of which the present suit originated, are stated, with some detail, in the case of *Cobb and Husband* v. *Parham* and *Lowry*, 4th Ann. 148.

This court affirmed the judgment of the District Court for the parish of Madison, dissolving an injunction obtained by *Mrs. Cobb and Husband*, against the execution of an award of arbitrators and amicable compounders of suits and controversies which had existed between them and *A. J. Lowry* in relation to a plantation and slaves, and the crops thereof, held in joint ownership by them. The award had been homologated by the court, and *William S. Parham*, in pursuance of its terms, appointed agent of the parties to carry it into effect.

To obtain the injunction, the plaintiffs gave bond, with the present defendant, *A. H. Harris*, as their surety, in the sum of three thousand dollars. In dissolving the injunction, the district court, by its judgment, which was affirmed by this court, reserved the right of the defendant, *Lowry*, to sue for damages, or upon the injunction bond if he chose.

The present suit is brought upon the injunction bond against *Mrs. Cobb* and *Husband* and their surety, the plaintiffs alleging that they have suffered damages to more than the amount of the bond in consequence of the injunction. *Mrs. Cobb* died during the pendency of the suit. Its prosecution has been continued

PARHAM
v.
COBB.

against *Harris*, the surety. Judgment has been rendered against him for the amount of the bond, and he has appealed.

It is contended that, by the terms of the bond, he is liable only for the amount which *Lowry* may recover against *Cobb and Wife*, his principals; that no judgment has been rendered against them, and, therefore, none can be had against the surety.

The terms of the bond referred to, are thus expressed: " Now, the condition of the above obligation is such, that if upon the trial of this suit it shall be decided that the injunction obtained is illegal, and unjust and contrary to law, and if the said *S. M. C.* and *A. B. Cobb* and *William H. Harris*, shall well and truly pay and satisfy all such costs and damages as the said *Parham* and *Lowry* may recover against them in case it shall be decided that the said writ of injunction has been wrongfully obtained, then this obligation to become null and void, otherwise to be and remain in full force and virtue." It is said, by these terms, there can be no judgment against the surety until there be a recovery against the principals.

The peculiar terms of this bond which gives rise to the argument are these : "Such damages as *Parham* and *Lowry* may recover against them." The accusative pronoun, them, refers to *Harris* as well as *Cobb* and *Wife*, and all being bound *in solido* does not affect the right of recovery against either. The phrase "may recover against them," considering the object of the bond, means the right to recover, rather than the fact of recovery. It is surplusage in the instrument, and if it throws any obscurity upon it we must refer to the condition of the bond required by the Code of Practice in order to obtain an injunction, and thus remove the obscurity by the legal condition of injunction bonds, to which, it is the presumption of law, that the parties intended to obligate themselves. " In order to obtain an injunction, the party applying for the same must annex to his petition his obligation in favor of the defendant for such sum as the court may determine, after having examined what injury the defendant may sustain from such injunction, with the surety of one good and solvent person, to secure the payment of such damages as may have been sustained by the defendant in case it should be decided that the injunction had been wrongfully obtained." Art. 304. This is substantially the condition of the bond in the present case, and neither more nor less.

The death of *Mrs. Cobb* is no reason for arresting the suit against her surety. They bound themselves *in solido,* and the surety is liable severally for the amount of the bond, if damages have been suffered to that amount.

It is next contended, that *Lowry* and *Mrs. Cobb* were partners in the plantation and slaves, and that the damages claimed in this suit grow out of the partnership; that therefore the partner cannot sue for them alone, but only for a general settlement of the partnership. The award of the amicable compounders fixed the mode in which the partnership should be conducted. The injunction was obtained in violation of the award. It was, therefore, a violation of the rights of the other partner, sanctioned by a judgment of that character that commands the most favor with all men. Now the bond required, in order to obtain an injunction against a judgment, is provided by law, in order to place the parties in *statu quo*, if it should be decided that it was unlawfully obtained. If the injunction has caused the plaintiffs' damages, the parties are not in the situation in which they were before the injunction. Yet, it is an equitable writ, and he who claims equity must give assurance that equity shall be done. It would not afford an equitable indemnification that the partner, whose rights being judicially

ascertained, are afterwards violated by an injunction, should merely have a claim for damages at the winding up of the partnership. On the contrary, as soon as the injunction is dissolved, the bond given for this equitable process should place him in the situation he was before the injunction issued. The long and ingenious argument of the defendants' counsel, on this subject, tends to this conclusion alone, that the bond is an asset of the partnership, which cannot be sued upon by one of the partners. We think, on the contrary, that it belongs to the defendant in injunction alone, and is given to him by law, to indemnify him against the losses he has sustained by the injunction of his rights, unjustly obtained,

Arriving, then, at the merits of this controversy, we will state the objects of the parties in forming the partnership, and the means of accomplishing that object, in the clear and precise manner stated by their amicable compounders. It is somewhat lengthy, but that statement and a very short examination of events, subsequent to the award, will be decisive of the present case.

They say : " The evidence has developed circumstances that render it now impossible that the contracts (by which the parties became joint owners of the plantation and slaves, and regulated their partnership,) can be executed in the precise manner contemplated by the parties, whether we adopt the construction contended for by one or the other. But there are considerations that entered into and made a part of those agreements, and which, we believe, were a moving cause to the making of them, and deemed by both parties essential to their mutual interests and common protection, which we cannot overlook, and which we feel bound by every principle of justice and equity to enforce to the fullest extent of the powers conferred upon us."

" At the date of the sale, in 1843, of an undivided half of the property by *Mrs. Cobb* to *Lowry*, she was indebted to him in a large amount of money, some forty thousand dollars, the payment of which he did not consider secure. The property owned by her, and sold to him, was mortgaged to *Burke, Watt & Co.* and to the heirs of *Edward Mitchell*, for upwards of forty thousand dollars, an amount sufficient, at that time, to have sacrificed, at a forced sale, the whole or a large portion of it. *Lowry* had a small force which he could put upon the place. On the one hand, *Lowry* was in danger of losing the whole or a large portion of his debt, in consequence of the mortgages existing on the property of *Mrs. Cobb*. On the other, she was almost sure of losing the whole property from the combined claims of *Lowry* and the mortgage creditors.

" Hence it was natural that they should have made precisely such an agreement as they did make on the 10th of April, 1843, by which she sold to *Lowry* the undivided half of the Buckhorn plantation and slaves, and received as a consideration the release from the heavy debt owed by her to him, and also acquired a title to the undivided half of sixteen slaves, thus creating an additional force for the plantation, and increasing its revenues and augmenting her ability to liquidate the mortgage debts. By this sale she released herself from one heavy burthen, and increased her ability to raise the others.

" But she was not yet safe, neither was *Lowry*, as the mortgages bore upon that part of the property that had been sold to him by *Mrs. Cobb*. It was liable to be swept from him by the mortgage creditors ; if so he lost his debt.

" But the parties had now acquired the means, which if jointly and properly applied, would avert the consequences they both dreaded, the loss of his debt by the one, and the loss of her property by the other. By adopting the course they did, they believed that all the debts could be paid and the property saved.

PARHAM
v.
COBB.

"Hence, it was agreed that, 'all the aforesaid property should be used and cultivated jointly, and that the proceeds of the crops of the said plantation should be applied to the liquidation of the debts against said property.' For the portion of the crops belonging to *Lowry*, so applied, he was to be secured in the manner we shall hereafter state."

They then decide that a subsequent agreement, made in 1844, did not materially vary the first, and proceed : "Considering, then, that the agreement made originally between the parties, that the whole net revenue of the property should be applied to the extinction of the mortgage debts upon it, which, though not nominally against *Lowry*, yet might be made to cause the destruction of his debt, to have been made for their joint interest, and to have constituted an important element in their contract, we feel bound to have that agreement executed to the extent of our power, in the manner hereafter stated."

They then decide and settle many particular controversies between the parties, and continue : "Proceeding to carry into effect, to the extent of our ability, the original intentions of the parties, we order and direct that all the property constituting the Buckhorn plantation, the slaves thereon owned by the parties jointly, and every thing else belonging thereto, shall be kept together and cultivated as a whole until the first Monday of January, 1850." They provide at that date for the partition of the land and some of the slaves.

And then declare : "We divest from this date the said *Alfred J. Lowry* and the said *S. M. C. Cobb*, and her husband *O. B. Cobb*, of all personal right, authority and control over the said Buckhorn plantation, slaves, &c., and every thing appertaining thereto, both as relates to the management of said property and its cultivation, the control and disposition of its proceeds and revenues, and the manner they shall be applied and appropriated, and prohibit them from claiming or drawing any portion thereof, except a thousand dollars annually each, for their individual use."

"We nominate and appoint *William S. Parham, Esq.*, of the parish of Madison, and authorize him to take and have, from this date, the full, entire and complete control, management and administration of said Buckhorn plantation, slaves, &c., independent of and from any and all authority, control or dictation of the said joint owners or either of them, or of any one else, subject only to the rules herein laid down for his guidance for his duty to the parties and to the laws of the State,"

After prescribing some rules, it is said : "The crops shall be shipped and the accounts kept in the name of the Buckhorn plantation, *William S. Parham* agent. The plantation expenses shall be paid ; an annual salary of $750 allowed to *Parham*, and, as stated, a thousand dollars each, annually, to *Mrs. Cobb* and *Lowry*, and the balance remaining of the crop shall be appropriated annually and as soon as realized be paid over and credited upon the mortgage debts of *Mrs. Cobb. Parham* was required to render annual accounts on the 1st of March, 1848, 1849 and 10th of December, 1849."

"And within fifteen days after the rendition of each of said accounts, the said *Mrs. Cobb* and her husband are required to execute a special mortgage, before a notary of the parish of Madison, on her entire interest in the Buckhorn plantation, slaves, &c., in favor of *Lowry*, to reimburse to him such amount of the proceeds of the crops belonging to him as may have been appropriated to the payment of the aforesaid mortgaged debts, with six per cent. interest, from the date of the appropriation."

Provision was afterwards made for the final settlement of the accounts of the partnership, partition of the slaves and other particulars.

The award was rendered in March, 1847, was homologated by judgment of the court in the fall, and was fully carried into effect that year. And had it been carried out, the parties, no doubt, would have had a large estate unencumbered with debt, except the accounts and indebtedness between themselves, to divide at the times and upon the terms provided for by the award.

In January, 1848, *Cobb and Wife* totally repudiated the award. Obtained and issued their injunction against any control or management of the plantation and slaves by *Parham* or *Lowry ;* took possession of all the property, and kept the proceeds of the whole crop of that year.

These proceeds should, under the award, have been sacredly applied to the payment of their debts, for which the property of *Lowry* as well as their own was specially mortgaged, and they should have given a special mortgage on their part of the property, in favor of *Lowry,* for his half of the proceeds of the crop. He did not even receive out of the crop, the thousand dollars provided for his family supplies.

*Mrs. Cobb* and husband having thus obtained possession of the property and its proceeds, in consequence of the injunction, and having failed to appropriate them according to the award, now that the injunction is dissolved, are bound, with their surety, to the extent of their bond, to supply and make that appropriation.

Instead of appropriating the crop of 1848 to the payment of the mortgages against the property, *Cobb and Wife,* during the pendency of their injunction, submitted to the jurisdiction of the courts in New Orleans, and confessed judgments in favor of the mortgagee creditors. They thus not only failed to diminish the claims, by the crop of 1848, but voluntarily aided to defeat the very object of the partnership with *Lowry,* and of the award of their amicable compounders. And executions were issued, evidently by their consent, against the partnership property, for their individual debts, with a view to sacrifice their partner.

But, as the day of sale approached, adverse circumstances occurred ; the cholera was prevailing on the plantation. *Cobb* was sick ; he had not the proceeds of the crop of 1848, even to the extent of $8000, which it appears might have relieved him ; his friends deserted him, and he could not make arrangements with his creditors whom he had facilitated, by subjecting the property of his partner to their executions.

On the other hand, wealthy friends came to the aid of his partner, and purchased the property, no doubt, with the view of letting him have it when he reimbursed them the price. The violation of the award of the amicable compounders, and attempt to ruin their partner, will probably ruin *Cobb* and his wife's estate, while it only straitened the defendant in their injunction, and subject him, temporarily, to the generosity of his friends. The loss of the one, and the possibility that the other may finally relieve himself from the consequences of the injunction, cannot be considered in fixing the immediate and direct injury to the defendant in the injunction.

As the partnership property, sold for the debts of *Cobb and Wife,* was fairly appraised at $68,300, and was sold even at twelve months' credit for only $41,775, showing an immediate loss of $26,525, it might be a fair subject of inquiry, if necessary to sustain the claim for damages to the amount of the bond, whether

21

half this loss should not be chargeable to *Cobb and Wife* and their surety on the injunction bond, which loss amounts to far more than the amount of the bond.

There is no doubt *Parham* would have performed the duties of agent of the partnership property during the year 1848, but for the injunction, and have thus entitled himself to the salary allowed him by the award. There is no evidence that he actually resigned the office. He, therefore, is entitled to the amount of his salary, which is the damage allowed him by the judgment as caused by the injunction.

It is urged that but half the property was sold by the sheriff; that the estate of *Mrs. Cobb* owns half the remainder, and that her representative may compensate the fourth of the crops subsequent to 1848 against the bond, and that her surety may require the discussion of her remaining interest in the plantation and slaves, to indemnify him against liability on the bond.

The sale of at least half the plantation and slaves of the partnership for *Mrs. Cobb's* private debts, has so materially changed the relations of the parties, and must produce such an effect upon the award of the amicable compounders, and the management of the remaining partnership property and final settlement of the partnership, that nothing in relation to these subjects can be considered in this suit. It appears there are suits pending for the regulation of the partnership subsequent to the sale, and for its final settlement. The sale having defeated the original object of the partnership and the award under it, the remaining property and the settlement of the partnership must probably be governed by the ordinary principles of partnership, subject to the acquired rights of the partners.

*Mrs. Cobb's* estate can probably only claim a surplus on the winding up of the partnership, and, if so, the surety can claim no greater right. On these subjects, however, we express no opinion further than to show that the bond has not been compensated, and that the payment thereof cannot be delayed by the surety for the discussion of the property of his principal.

The judgment of the district court is affirmed, with costs.

SLIDELL, J. I had doubts, arising out of the peculiar phraseology of the bond, but have yielded them to the unanimous opinion of my brethren.